UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| AMALGAMATED TRANSIT UNION LOCAL 1546, ET AL. | CIVIL ACTION |
| VERSUS | |
| CAPITAL AREA TRANSIT SYSTEM | NO. 20-00888-BAJ-RLB |

RULING AND ORDER

Before the Court is Defendant's **Renewed Motion To Compel Arbitration And To Stay Proceedings Pending Arbitration And Motion To Dismiss Claims Pursuant To Fed.R.Civ.P. 12(b)(6) (Doc. 23)**. Plaintiffs Amalgamated Transit Union Local 1546, Toye Hebert, and Shavez Smith oppose Defendant's Motion. (Doc. 30). For the following reasons, Defendant's Motion will be granted in part, and this action will be stayed to allow the parties' remaining arbitral proceedings to conclude.

I. RELEVANT BACKGROUND

This labor dispute features a global pandemic, a sex tape,[1] and allegations of union-busting after an employee boycott of a public Juneteenth celebration. The question presently before the Court is whether to stay this case to allow the parties to conclude parallel arbitral proceedings that will resolve at least some of the issues in dispute. In answering this question, the Court assumes the following allegations

---

[1] According to Plaintiffs, and as detailed below, the alleged labor dispute followed Defendant's investigation into a widely-distributed cell phone video featuring two Capital Area Transit System employees engaged in consensual sex. (Doc. 17 at ¶ 26).

are true.

Defendant Capital Area Transit System ("CATS") is an independent agency that provides bus service to residents and visitors of Baton Rouge, Louisiana. CATS' employees—specifically its drivers and mechanics—are represented by Plaintiff Amalgamated Transit Union Local 1546 ("Local 1546" or the "Union").

On June 22, 2018, CATS and Local 1546 executed a Labor Agreement (the "Agreement") setting forth terms regarding "rates of pay, wages, hours, and working condition of employment" for all covered employees. (Doc. 7-3 at 3, 42). The Agreement expressly recognizes Local 1546 "as the exclusive bargaining representative of all … employees covered by this Agreement." (*Id.* at 3).

Most relevant here, the Agreement establishes a detailed process for resolving workplace disputes between CATS and its covered employees. (*See* Doc. 7-3). Article 4 ("Discipline") states that "[n]o employee shall be disciplined except for just cause," and further provides that in the event CATS proceeds with a disciplinary action, covered employees "shall have the right to be heard in accordance with the grievance procedure as described in Article 5." (*Id.* at 5).

Article 5 ("Grievances and Grievance Procedure"), in turn, states that "any grievance shall be settled according to the grievance and arbitration procedures herein contained." (*Id.* at 10).

Article 6 ("Arbitration and Arbitration Procedure") sets forth the rules governing arbitral proceedings between CATS and covered employees, and states that "[t]he decision by a majority of the Board of Arbitration shall become final and

binding on the parties to this Agreement when delivered to them in writing." (*Id.* at 13).

Notably, the Agreement expressly defines "grievance" to include "[a]ny controversy between the Agency [CATS] and the Union [Local 1546] as to whether or not any employee suspended or discharged was so disciplined for cause." (*Id.* at 10). Further, the Agreement lists various "[m]ajor rule infractions" which "may subject [an] employee to suspension or discharge," including "[g]ross misconduct." (*Id.* at 6). "[A]ctions such as theft, sabotage, bullying, violence, sexual harassment, possession of firearms, and arson constitute gross misconduct." (*Id.*).

The present dispute between CATS and Local 1546 began in mid-2020, after the first wave of the COVID-19 pandemic swept through Baton Rouge (and the rest of the country). As alleged, Local 1546 and its executive officers and board members repeatedly criticized CATS and CATS' CEO William Deville for failing "to provide drivers and mechanics with protective equipment," for failing to "enforce protocols to protect members from COVID 19 infection, including testing and contact tracing," and for "switching insurance brokers and saddling workers with higher costs." (Doc. 17 at ¶¶ 13-14). Tensions boiled over in June 2020, when Local 1546's executive board urged its members to boycott CATS' annual Juneteenth celebration to protest "the removal of [Union President Yvette Rhines] from her light duty assignment." (*Id.* at ¶¶ 19-20). According to Plaintiffs, "[t]he absence of CATS employees at a CATS event was an embarrassment and angered CATS management," prompting CATS to initiate "an investigation" into each of the Union's executive board members. (*Id.* at

3

21-22).

Allegedly, CATS' investigation was intended to harass, intimidate, and, ultimately, terminate the Union's executive officers and board members "in reprisal" for their criticism of CATS' pandemic response. (*See id.* at ¶¶ 37, 48). However, Plaintiffs expressly admit that, at the *same* time, CATS was *also* investigating a cell-phone sex video featuring two CATS employees engaged in "consensual sex," which had been widely distributed among the Union's members, *including* its executive board. (*Id.* at ¶¶ 26-28). Although presently unclear whether (and to what extent) the sex tape featured in CATS' "investigation," it is undisputed that as of December 2020 CATS had "fired five of the six [Local 1546] officers." (*Id.* at ¶ 36).

These firings prompted the Union, joined by Union President Yvette Rhines, Vice President George DeCuir, Treasurer Toye Hebert, and Executive Board Members Shavez Smith and Anthony Holmes (*i.e.,* the five discharged officers) to sue CATS on December 31, 2020. (Doc. 1). Plaintiffs' original complaint alleged that "[n]one of these systematic firings had anything to do with the efficient operation of the transit system," and instead were "reprisal for speech protected by the First Amendment and critical of CATS," with the ultimate goal of "eliminat[ing] the leadership of the ATU Local 1546, so as to set the stage for withdrawing recognition of the local union as its employees' bargaining representative." (*Id.* at ¶¶ 1, 29). On this basis, Plaintiffs asserted that CATS' actions violated their First Amendment rights to free speech and association, thus entitling them to declaratory and injunctive relief protecting them from further reprisals. (*Id.* at p. 7). Additionally, the

4

officer Plaintiffs sought reinstatement of their employment at CATS. (*Id.*).

On March 29, 2021, Plaintiffs filed their First Amended Complaint, which amplifies and adds detail to Plaintiffs' original allegations. (Doc. 17). Notably, Plaintiffs' First Amended Complaint persists in its core allegation that Local 1546's officers were fired in retaliation for "engaging speech protected by the First Amendment," as part of a broader "plan to … 'replace' the union leadership." (*Id.* at 1). And, as in the Original Complaint, the officer Plaintiffs seek reinstatement of their employment with CATS. (*Id.*; *see also id.* at 13).

Even as Plaintiffs have pursued this litigation, they have also proceeded with binding arbitration under the Agreement. These parallel arbitral proceedings have, as of now, resulted in a decision upholding the termination of Treasurer Hebert. (*See* Doc. 16-1). Notably, the Arbitrator found "just cause" for Treasurer Hebert's termination based on her "gross misconduct," which, among other things, included possession and distribution of the sex tape. (*Id.* at 18-21). Relevant here, the Arbitrator concluded:

> Harassment of a sexual nature of any employee in the workplace with enough frequency and severity to create a hostile or offensive work environment is prohibited by Title VII of the Civil Rights Act of 1964. The substantiated harassment seen in this matter, at the hands of the Grievant [Hebert] and others, represents a reprehensible example of sexual harassment prohibited by law, the Agency's work rules, and the parties' Contract. The Agency's efforts to eradicate sexual harassment from the workplace is a responsible effort to protect their [sic] employees. It is also legally required. Employees who refuse to cooperate and be truthful in that effort have forsaken the right to remain employed in that workplace. The Grievant's harassing behavior is compounded by her dishonesty and her efforts to stymie the Agency's investigation of the harassment, for which she was specifically terminated.

(*Id.* at 18-19). The Arbitrator's Decision avoided the question of whether Treasurer

5

Hebert's termination was part of a "larger conspiracy by [CATS] to eradicate the Union," determining that "[t]hese allegations … have no established relevancy to the narrow issue of whether or not the Grievant was terminated for just cause for her unilateral conduct in the workplace." (*Id.* at 19).

Additionally, these parallel proceedings have prompted three Plaintiffs—President Rhines, Vice President DeCuir, and Board Member Holmes—to resolve their claims against CATS and withdraw from this case. (*See* Docs. 17 at ¶¶ 2-6; 34; 35).

Now before the Court is CATS' Renewed Motion To Compel Arbitration And To Stay Proceedings Pending Arbitration And Motion To Dismiss Claims Pursuant To Fed.R.Civ.P. 12(b)(6) (Doc. 23), which seeks an order compelling the remaining Plaintiffs to submit their claims to arbitration under the Agreement, or staying this action to allow existing arbitral proceedings to run their course. Alternatively, CATS seeks dismissal, asserting that the remaining Plaintiffs have failed to state a cognizable First Amendment violation.

Plaintiffs oppose CATS' Motion, contending that there is no need to compel arbitration because "[t]he parties have arbitrated and continue to arbitrate," (Doc. 30 at 4), that a stay of this case is inappropriate because Plaintiffs' First Amendment claims deserve immediate vindication, and that their First Amendment "reprisal" claims are adequately stated and withstand dismissal.

For reasons explained below, the Court determines that the remaining Plaintiffs' First Amendment claims must be stayed pursuant to Section 3 of the

6

Federal Arbitration Act because the facts underlying these claims are necessarily intertwined with the issue of whether the officer Plaintiffs were discharged for cause. As such, the Court does not address CATS' remaining arguments.

## II. DISCUSSION

### A. Standard

The Federal Arbitration Act, 9 U.S.C. §§ 1–16 ("FAA"), expresses a strong federal policy in favor of enforcing arbitration agreements.[2] *See, e.g.*, *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217–18 (1985); *Southland Corp. v. Keating*, 465 U.S. 1, 10, (1984); *Safer v. Nelson Fin. Group Inc.*, 422 F.3d 289, 294 (5th Cir. 2005). Indeed, the Supreme Court has explained that the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter*, 470 U.S. at 218.

Most relevant here, Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application

---

[2] There does not appear to be any disagreement among the parties that the FAA applies to this dispute. In any event, the Court's analysis would be the same even if the Louisiana Binding Arbitration Law, La. R.S. § 9:4201, were to apply because, as noted recently by the U.S. Court of Appeals for the Fifth Circuit, the FAA and its Louisiana counterpart are "virtually identical." *See Badgerow v. Walters*, 975 F.3d 469, 472 (5th Cir. 2020) (rejecting argument that the Court's analysis of arbitrability would differ whether the FAA or the Louisiana Binding Arbitration Law controlled, explaining that "even if the Louisiana Arbitration Law were to apply, 'Louisiana courts look to federal law in interpreting the Louisiana Arbitration Law because it is virtually identical to the United States Arbitration Act[.]'" (quoting *Chevron Phillips Chem. Co., LP v. Sulzer Chemtech USA, Inc.*, 02-598 (La. App. 5 Cir. 10/29/02), 831 So. 2d 474, 476, *writ denied*, 2003-0011 (La. 3/14/03), 839 So. 2d 47)).

7

> of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. "Section 3 … is broad enough to permit the stay of an entire action even though only some of the issues in the lawsuit are referable to arbitration." *Cybertek, Inc. v. Bentley Sys., Inc.*, 182 F. Supp. 2d 864, 871 (D. Neb. 2002) (discussing authorities); *see also Miller v. Aaacon Auto Transp., Inc.*, 545 F.2d 1019, 1020–21 (5th Cir. 1977) ("Once being satisfied … 'that the issue involved in such suit or proceeding is referable to arbitration under such an agreement,' the district court seems to be required by [Section 3] to, upon application, 'stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.'").

The Court applies a two-step analysis to assess whether an issue is referrable to arbitration. *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008). First, the Court determines whether the parties have agreed to arbitrate the particular dispute. *Id.* This first step, itself, is divided into two questions: "(1) is there a valid agreement to arbitrate the claims and (2) does the dispute in question fall within the scope of that arbitration agreement." *Sherer*, 548 F.3d at 381. "[A]ny doubts concerning the scope of an arbitration agreement should be resolved in favor of arbitration." *Safer*, 422 F.3d at 294.

Second, upon being satisfied that the parties have agreed to arbitrate a dispute, the Court asks whether "any federal statute or policy renders the claims nonarbitrable." *Sherer*, 548 F.3d at 381 (quoting *Wash. Mut. Fin. Group, LLC v.*

8

*Bailey*, 364 F.3d 260, 263 (5th Cir. 2004)).

### B. Analysis

At the first step, the parties plainly agreed to arbitrate at least some (if not all) of the issues raised in this case. The validity of the parties' Agreement is uncontested, leaving only the question of whether the Agreement's arbitration clause is broad enough to cover the parties' dispute. The Court has little trouble answering this question in the affirmative. To recall, Article 5 of the Agreement requires the parties to arbitrate "any grievance," *and* expressly defines "grievance" to include "[a]ny controversy between the Agency [CATS] and the Union [Local 1546] as to whether or not any employee suspended or discharged was so disciplined for cause." (Doc. 7-3 at 10). Here, the two remaining officer Plaintiffs—Shavez Smith and Toye Hebert—allege that they have been discharged from their employment at CATS, and seek reinstatement. (Doc. 17 at ¶¶ 4-5). These Plaintiffs assert that they were discharged in retaliation for exercising protected First Amendment rights, yet, at the same time, expressly *admit* that they were each also under investigation for having possessed the sex tape and distributed it to other CATS employees. (Doc. 17 at ¶¶ 22-28). Plaintiffs' involvement with the sex tape, if proved, would be an obvious violation of the Agreement's prohibition against sexual harassment, and also a "major rule infraction" establishing cause for immediate suspension or discharge. (Doc. 7-3 at 6). Whatever may ultimately be said of Plaintiffs' First Amendment claims, this threshold issue of *cause* for Plaintiffs' discharge is plainly reserved for arbitration. (Doc. 7-3 at 10).

Having determined that the parties agreed to arbitrate the threshold issue of

whether Plaintiffs were discharged for cause, the only remaining question is whether a federal statute or policy renders this issue nonarbitrable. No such prohibition exists. *E.g.*, *United Steel v. Delek Ref., Ltd.*, 575 F. App'x 330, 336 (5th Cir. 2014) (affirming arbitrator's decision that sufficient cause existed to suspend employee under operative collective bargaining agreement).

In sum, the Court determines that the threshold issue of whether Plaintiffs Hebert and Smith were discharged for cause is "referable to arbitration" under the Agreement. 9 U.S.C. § 3. As illustrated herein, even if Plaintiffs' First Amendment claims ultimately do not fall strictly within the scope of the Agreement's arbitration clause, they nonetheless involve questions of fact which are common to the issue of whether "cause" justified Plaintiffs' discharge, and the arbitrator's findings on this issue may be dispositive. It is therefore appropriate to stay the entire action under Section 3 of the FAA to allow the parties' parallel arbitral proceedings to run their course.[3] *E.g.*, *Cybertek*, 182 F. Supp. 2d at 871-72 (staying action under Section 3 of the FAA to allow plaintiffs' parallel arbitral proceedings to conclude where arbitrable claims shared questions of fact with nonarbitrable claims).

---

[3] Section 3 of the FAA compels a stay of this case. Even if it did not, however, the Court would still stay these proceedings pursuant to its inherent power to manage its docket and to promote efficiency and judicial economy. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."). After all, it is decidedly *inefficient* to conduct parallel proceedings addressing the same underlying issues. Moreover, the procedural history of this case illustrates that judicial economy is served by pausing to allow the arbitral proceedings to conclude, particularly given that three of the original six Plaintiffs have resolved all claims against CATS in light of these parallel arbitral proceedings.

10

### III. CONCLUSION

Accordingly,

**IT IS ORDERED** that CATS' Renewed Motion To Compel Arbitration And To Stay Proceedings Pending Arbitration And Motion To Dismiss Claims Pursuant To Fed.R.Civ.P. 12(b)(6) (Doc. 23) be and is hereby **GRANTED IN PART**, and that this action be and is hereby **STAYED** pursuant to 9 U.S.C. § 3 pending arbitration of all claims that are alleged by remaining Plaintiffs Local 1546, Treasurer Hebert, and Executive Board Member Smith, or by the Plaintiffs jointly.

**IT IS FURTHER ORDERED** that the parties shall each file a status report, not less than once every three months, regarding the progress of their arbitral proceedings.

**IT IS FURTHER ORDERED** that immediately upon the conclusion of all remaining arbitral proceedings, Plaintiffs shall file a motion to lift the stay set forth herein. Alternatively, if after the conclusion of all arbitral proceedings the remaining Plaintiffs determine not to proceed with this litigation, Plaintiffs shall file a notice of dismissal consistent with the requirements of Federal Rule of Civil Procedure 41.

**IT IS FURTHER ORDERED** that in all other respects, CATS' Motion is **DENIED**, without prejudice to CATS' right to renew their arguments (as appropriate) pending the conclusion of the remaining Plaintiffs' arbitral proceedings.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to close this

case for statistical purposes.

                Baton Rouge, Louisiana, this 29th day of November, 2021

                _____
                **JUDGE BRIAN A. JACKSON**
                **UNITED STATES DISTRICT COURT**
                **MIDDLE DISTRICT OF LOUISIANA**